**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:11cv6**

| | | |
|---|---|---|
| C. STEVEN YATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| MEDICAL SPECIALTIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

THIS MATTER is before the court on the parties' respective motions and briefs (#s 28, 29, 32, 33, 34) for the construction of certain claim language in U.S. Patent No. 5,067,486 ("the '486 patent"). The court held a claim construction hearing on July 30, 2012, and at the court's request, the parties provided supplemental briefings and proposed orders (#s 36, 42). Having carefully reviewed the motions, the court issues the following findings and Order.

I. **Procedural History**

As set forth in this court's Memorandum of Decision of June 6, 2011, (#18), plaintiff C. Steven Yates filed his Complaint in the North Carolina General Court of Justice, Case No. 10CVS24536 (Mecklenburg Co. Sup. Ct. 2010) and defendant filed a Notice of Removal on January 5, 2011 (#1). Defendant Medical Specialties, Inc. ("MSI") filed an Answer and Counterclaim on January 12 (#4), and plaintiff replied to the Counterclaim on February 1 (#5).

Defendant filed a Motion to Consolidate this matter with a parallel declaratory judgment action. See Medical Specialties, Inc. v. Yates, 3:11cv7 (W.D.N.C). This court issued a Memorandum, determined that defendant properly removed the case to federal court, that subject-matter jurisdiction exists and denied defendant's Motion to Consolidate. The court also made the following findings:

> Resolution of whether MSI had a legal obligation to pay Yates fees under the contract for devices developed after 1996 clearly turns on the resolution of a patent issue, to wit, whether the later developed devices are within the scope of claims embodied in the '486 patent, as made clear in paragraph 12(a) of the Complaint. While the court agrees with Yates that such issue may well not require a full-on Markman hearing, and could even be resolved through discovery, MSI properly removed this action as state tort law creates the causes of action, but the well-pleaded Complaint requires patent-law questions to be resolved.

Mem., p. 10.

Following a pretrial conference on August 1, 2011, the court established a Patent Claim Construction Scheduling Order (#20), and the parties submitted Patent Claim Construction Briefs (#s 28, 29, 32, 33). A Markman Hearing was completed on July 30, 2012, after which the court requested that the parties submit proposed Orders. Notwithstanding the court's Memorandum of Decision, plaintiff characterized the issues discussed at the Markman hearing as primarily a breach of contract matter rather than a run-of-the-mill patent-infringement case. Specifically, plaintiff seeks money to which he believes he is entitled under a 1996 settlement agreement, based on sales of defendant's products using the '486 patent. Plaintiff asks that the court accept definitions previously

defined by defendant (therein plaintiff) in a previous lawsuit. See Med. Specialties, Inc. v. McDavid Knee-Guard, Inc., Case No. 3:00cv282 (W.D.N.C.).

In response, defendant admits that it ceased payment to plaintiff for royalties under the settlement agreement for products covered by the claims of the '486 patent following the expiration of the '486 patent on March 28, 2010. Answer, ¶ 19.

A supplemental telephone conference was conducted following the Markman hearing on August 10, 2012, at which time the parties were asked to provide Supplemental Briefs on the issue of whether, if the '486 patent is narrowly construed, what features of the patent in suit are used in defendant's ASO EVO or other models using ASO technology. Following the conference, each party submitted a Supplemental Brief and proposed Order (#s 36, 42).

Having been fully briefed and argued, the issue of defendant's liability to plaintiff is now ripe for disposition. Resolving the issue will require a determination of which of defendant's products, if any, fall within the meaning of "similar items using the ASO patent number 5,067,486" as set forth in the settlement agreement. Such determination requires an analysis of the terms contained in the settlement agreement, the principles of claim construction, and the parties' prior statements and course of dealing.

## II.    Factual Background

As set forth in this court's Memorandum of Decision (#18), in 1989, defendant began paying plaintiff for his specialized knowledge and assistance in developing, evaluating, commercializing, and promoting the '486 patent. Defendant marketed the item as the ASO ankle brace and offered professional and retail versions. Plaintiff sued defendant in 1995

after defendant failed to compensate plaintiff for fees he claims were due, and the parties settled the matter and executed a settlement agreement in 1996.

Unfortunately, the drafters of the Settlement Agreement did not address certain issues, including the inevitable expiration of the '486 patent, or whether plaintiff's heirs would benefit in the event that royalties would become due after plaintiff's death. In relevant part, the 1996 Settlement Agreement provides:

> Beginning on January 1, 1996, Medical Specialties agrees to resume its payment of a development fees to Yates in the amount of 37.5 cents per unit sold of **both the ASO and ASO Axis product or similar items sold by Medical Specialties using the ASO patent number 5,607,486**. These development fees are to be paid quarterly on the 15[h] day of the next month following the end of each quarter. Said development fees shall be paid as long as Medical Specialties and/or their assigns sells **ASO and ASO Axis or similar items using the ASO patent number 5,067,486**.

Settlement Agreement, attached to Plaintiff's Construction Brief as Exh. B., p. 3 (emphasis added). One of plaintiff's attorneys stated during the <u>Markman</u> hearing that he was involved with the drafting and execution of the settlement agreement and indicated that the agreement was designed to benefit plaintiff only for the duration of plaintiff's life.

Defendant continued to develop new products (including the ASO EVO in approximately 2008), and provided payment to plaintiff for many years, but stopped payment in 2010. During the same time when the '486 patent was scheduled to expire, defendant obtained a new patent based upon the '486 patent and began selling the "ASO Flex-Hinge." No longer receiving the agreed to royalties, plaintiff filed this action.

III.    **Applicable Law and Discussion**

   A.    **Contract Interpretation**

In support of its claims, plaintiff argues that the term "similar" as used in the 1996 Settlement Agreement is "pivotal to the Court's resolution of Plaintiff's breach of contract claims." Pl. Supp. Br., p. 2. Plaintiff cites Newman v. Raleigh Internal Med. Assocs., 88 N.C.App. 95, 96 (1987) for the proposition that "similar," as defined by the American Heritage Dictionary, means "[r]elated in appearance or nature; alike though not identical." Id., p. 99, 362 S.E.2d at 626. Plaintiff concludes that defendant's ASO Devices developed subsequent to the original ASO and ASO Axis (which include the ASO Max, ASO Speed Lacer, ASO Universal, ASO with Stays, ASO Flex-Hinge, and ASO EVO) all fall under the Newman definition of "similar." Plaintiff further "reserves the right to seek compensation for . . . any other similar devices" including the ASO Vortex and other devices of which he becomes aware. Supp. Br., pp. 3-4, n. 4.

Defendant does not dispute that the subsequent ASO devices, except for the EVO, were marked with the '486 patent number in compliance with the patent marking statute. Because the '486 patent has now expired, it appears that the products no longer contain the '486 mark. With respect to plaintiff's references to the disputed devices in this case as "embodiments of the invention" or "covered devices" or any other term, defendant has attempted to parse such definitions. It is clear that there are a number of products in question and the court will not allow defendant's attempt to limit plaintiff's claims in such a manner.

With respect to construing the "similar terms" to the '486 patent in the 1996

Settlement agreement, the court accepts the Newman court's definition of "similar." Consistent with the Newman definition, the devices are, indeed, "alike though not identical," and they are all related in appearance and nature. However, the court finds that it must rely on the principles of claim construction for more precise definitions of the '486 patent, and it cannot substitute its own definition of a vague and indefinite agreement.

Furthermore, as this matter is presently before the court for Markman review, such discussion of terms found in the 1996 settlement agreement between the parties is limited to claims construction and is not intended to bind the court or the parties as to plaintiff's breach of contract claim, including whether the parties agreed to compensate the plaintiff for other derivative uses of the '486 patent. There are issues of fact yet to be resolved by a jury on plaintiff's breach of contract claims.

### B. Judicial Estoppel

The Supreme Court suggests three factors to determine when judicial estoppel should apply: (1) the party's later position must be clearly inconsistent with the earlier position; (2) the party must have succeeded in persuading a court to adopt the earlier position in the earlier proceeding; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (finding that if a litigant "assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"). "Additional considerations may inform the doctrine's application in specific factual

contexts." Id. at 751.

The Fourth Circuit has interpreted judicial estoppel to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court. Zinkand v. Brown, 478 F.3d 634, 638 (4th Cir. 2007). Instead of factors, it has a three-part test which must be satisfied before applying judicial estoppel: (1) defendant must seek to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the prior inconsistent position must have been accepted by the court; and (3) defendant must have "intentionally misled the court to gain unfair advantage." Id. The bad faith requirement is the "determinative factor." Id. (internal citation omitted).

In another decision of the Fourth Circuit, the court noted that "the judicial process is not some kind of game." Pa. Nat. Mut. Cas. Ins. Co. v. Roberts, 668 F.3d 106, 117 (4th Cir. 2012). If a litigant "assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citation omitted). Judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Pegram v. Herdrich, 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts, 668 F.3d 106, 117 (4th Cir. 2012) (declining to resolve issue of judicial estoppel but noting that defendant's previous position undermined the credibility of her current

argument).

Judicial estoppel additionally protects the "essential integrity of the judicial process" and prevents parties from "playing fast and loose" with the courts. Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982). Plaintiff further points out that the Federal Circuit has applied judicial estoppel in the claim construction context, where the parties attempted to argue different claim construction positions on appeal. See, e.g., Interactive Gift Express v. CompuServe, 256 F.3d 1323, 1344-49 (Fed. Cir. 2001); Key Pharm. v. Hercon Labs. Corp., 161 F.3d 709, 715 (Fed. Cir. 1998).

Defendant previously sued a competitor for infringement of the '486 patent, and plaintiff raises judicial estoppel in order to give weight to defendant's prior definitions of terms used in the patent. In 2000, defendant sued McDavid Knee-Guard, Inc. ("McDavid") in this court, alleging that McDavid sold an ankle brace that infringed the '486 patent. See Medical Specialties Inc. v. McDavid Knee-Guard, Inc., Case No. 3:00cv282 (W.D.N.C. June 13, 2000), Compl., ¶ 7. In that case, MSI's officers provided sworn statements as to the meaning of various claim terms contained in the '486 patent, many of which involve the same claim terms which are now in dispute.

A review of the docket in McDavid shows that the court issued a Memorandum and Order on March 18, 2003, in which it determined that McDavid did not literally infringe the '486 patent, but denied both parties' Motions for Summary Judgment. MSI filed a Motion to Vacate (#51) and an accompanying Memorandum in Support (#51), in which it claimed that it "could be unfairly saddled with a claim construction that has not been reviewed and

that could negatively impact MSI's rights vis-a-vis the public at large." Id., p. 2. On February 17, 2004, the court granted MSI's unopposed Motion to Vacate, based upon the settlement reached by the parties. This court finds that MSI's Motion to Vacate in McDavid, and this court's granting of that motion, was intended to avoid an unfavorable claim construction against MSI in future claim construction challenges based on judicial estoppel. Plaintiff claims that defendant should be judicially estopped from asserting positions during claim construction that are clearly inconsistent with defendant's previous definitions submitted in McDavid. Defendant claims that its previous definitions are taken out of context, were not accepted by the court, and are not binding in this matter.

Defendant now pursues a narrow construction of the '486 patent while defending its product and expired patent, having previously advocated for a more broad construction as a plaintiff seeking to enforce its patent. Having carefully considered all aspects of the test for judicial estoppel, the court will consider defendant's prior admissions, but will not go so far as to find that judicial estoppel applies. The court will also consider the previous interactions between the parties as extrinsic evidence factors in its claim construction analysis.[1] To otherwise limit defendant's prior admissions at plaintiff's expense would be inconsistent and unjust.

_____

[1]    There is ample evidence in the record that plaintiff's contributions to defendant's products were invaluable. For example, in 2011 defendant's Vice President of Production and Research and Development agreed that two of its current models, the ASO with Stays and ASO Speed Lacer, could not have been manufactured without the '486 patent. Gaylord Deposition, attached to Plaintiff's Supp. Br. as Exh. 1, p. 132. He acknowledged similarity to the '486 patent with the ASO Max and ASO Universal. Id., 138, 141.

### C. Principles of Claim Construction

"The determination of infringement is a two-step process. First, the court construes the claims to correctly determine the scope of the claims. Second, it compares the properly construed claims to the accused device." Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001). The first step in this process, the construction of claims, is a question of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted). The Court should give the disputed claim terms "their ordinary and accustomed meaning as understood by one of ordinary skill in the art." Bell Atlantic, 262 F.3d at 1267. A person of ordinary skill in the art is deemed to read the claim terms not only in the context of the particular claims in which the disputed terms appear, but also in the context of the entire patent, including the specification and the prosecution history. See Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005).

The claims of the patent "themselves provide substantial guidance as to the meaning

of particular claim terms." Id. at 1314. Specifically, the context in which a term is used within the claim, as well as the usage of that term in other claims of the patent, can be valuable in ascertaining the meaning of a particular claim term. Id. Of course, the claims of the patent cannot be viewed in a vacuum. The Court also "must look at the ordinary meaning in the context of the written description and the prosecution history." Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) (quoting DeMarini Sports, Inc. v. Worth, 239 F.3d 1314, 1324 (Fed. Cir. 2001)).

The specification of the patent can be highly instructive in construing the patent claims. As the Federal Circuit has noted, the specification "is always highly relevant to the claim construction analysis." Vitronics, 90 F.3d at 1582. In fact, the specification is usually dispositive, as "it is the single best guide to the meaning of a disputed term." Id.; Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985) ("The specification is . . . the primary basis for construing the claims."). As such, the Federal Circuit has stated that it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." Phillips, 415 F.3d at 1317. In some cases, the inventor may provide within the specification a special definition of a claim term which differs from the term's usual meaning. "In such cases, the inventor's lexicography governs." Id. at 1316. The inventor also may disclaim or disavow claim scope within the specification. Where "the inventor has dictated the correct claim scope, . . . the inventor's invention, as expressed in the specification, is regarded as dispositive. Id.

In addition to consulting the specification, the court also may examine the patent's

prosecution history in construing the terms of the claims. <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." <u>Phillips</u>, 415 F.3d at 1317. The prosecution history also may be helpful in determining whether the inventor disclaimed any particular interpretation during the prosecution of the patent. <u>See</u> <u>Chimie v. PPG Indus., Inc.</u>, 402 F.3d 1371, 1384 (Fed. Cir. 2005). While it can be helpful in some respects, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." <u>Phillips</u>, 415 F.3d at 1317.

In addition to examining the intrinsic evidence, the court is also authorized to consider certain extrinsic evidence, "including expert and inventory testimony, dictionaries, and learned treatises." <u>Markman</u>, 52 F.3d at 980. Specifically with respect to expert testimony, the Federal Circuit has noted that such testimony "can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person or skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." <u>Phillips</u>, 415 F.3d at 1318. The Federal Circuit has cautioned, however, that "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." <u>Id.</u> The court must disregard any expert testimony "that is clearly at odds with . . . the written record of the patent." <u>Key Pharms. v. Hercon Labs. Corp.</u>, 161 F.3d 709, 716 (Fed. Cir. 1998).

While extrinsic evidence may be useful in "shed[ding] . . . light on the relevant art," it is "less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting in part Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1318 (Fed. Cir. 2004)). "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Phillips, 415 F.3d at 1319.

As set forth above, the parties have disagreed from the outset of this case whether a typical patent case law is necessary or whether traditional contract law principles apply. Indeed, plaintiff seeks to adopt many of the positions taken by defendant in its litigation against McDavid, and the court finds that such extrinsic evidence will be helpful in its determination, although not dispositive.

An additional source of extrinsic evidence is the course of performance between the parties with respect to the ASO EVO, see Def. Resp. to Court's Request, p. 15. In 2008, after plaintiff examined the EVO and asked about payments owed to him, defendant told him that the EVO "was not covered by the '486 patent and that he would not be paid under the 1996 agreement." Def. Resp. to Court's Request, p. 15. It appears that Plaintiff made no further inquiry into the matter. Id.

A.     '486 Claim Terms

The '486 patent describes an ankle brace with certain, specific claim limitations. The '486 patent contains two independent claims (Claims 1 and 8) and the remaining eight

-13-

dependent claims (Claims 2-7 and 9-10). Independent Claim 1 is set forth below. Independent Claim 8 will not be individually addressed because it includes the same claim limitation for construction.

1.  An ankle stabilizing appliance adapted to provide protection against lateral ankle sprain during participation in sport activities, and comprising a boot-like body member of flexible non-elastic material and adapted to receive the ankle and the rear foot portion of the wearer therein, said body member comprising an ankle portion adapted to overlie the sides and rear of the ankle of the wearer and having a length sufficient to extend above the malleoli of the wearer, a foot portion adapted to extend under the foot of the wearer, and opposing laterally spaced apart front edges extending along the full length of said ankle portion and said foot portion, and with said ankle portion defining an inside panel on one side of the ankle, an outside panel on the other side of the ankle, and a rear edge portion which extends vertically between the inside and outside panels and thus along the Achilles tendon of the wearer, interconnection means for drawing said front edges of said body member toward each other so as to permit said body member to be tightly secured about the ankle and rear portion of the foot of the wearer, a pair of elongate non-elastic stabilizing straps, with said straps each having a first end fixed to said ankle portion at said rear edge portion thereof and at an elevation so as to be located above the malleoli of the wearer, and an opposite free end, and with said straps extending laterally in opposite directions and so as to define an inside strap extending from said rear edge portion toward said inside panel and an outside strap extending from said rear edge portion toward said outside panel, first pressure sensitive releasable closure means attached to said inside panel of said ankle portion and to said free end of said inside strap, and second pressure sensitive releasable closure means attached to said outside panel of said ankle portion and to said free end of said outside strap, a pair of binding straps, with said binding straps each having a first end fixed to said ankle portion at said rear edge portion thereof at an elevation corresponding to that of said stabilizing straps, and an opposite free end, and with said binding straps extending laterally in

opposite directions and overlying said stabilizing straps, and pressure sensitive closure means attached to said free ends of said binding straps, whereby said inside strap may be brought across said inside panel of said ankle portion, over the top of the wearer's foot, downwardly across the outside of the wearer's foot, under the wearer's foot, and then upwardly and so that said free end thereof may be releasably attached to said inside panel of said ankle portion, and whereby said outside strap may be brought across said outside panel of said ankle portion, over the top of the wearer's foot, downwardly across the inside of the wearer's foot, under the wearer's foot, and then upwardly so that said free end thereof may be releasably attached to said outside panel of said ankle portion, and such that said binding straps are adapted to be looped about the ankle of the wearer and interconnected to each other and so as to overlie portions of said stabilizing straps and said interconnection means.

Initially, claims 1-2 and 8-9 were rejected by the Examiner, and claim 1 was amended to state that the stabilizing straps of the ankle brace each had a first end fixed to the rear edge portion "at an elevation so as to be located above the malleoli of the wearer." The Examiner issued a second Official Action rejecting claim 1 and other claims, and claim 1 was further amended to include the following limitation: "a pair of binding straps, with said binding straps each having a first end fixed to said ankle portion at said rear edge portion thereof at an elevation corresponding to that of said stabilizing straps." The amended claims were allowed and the '486 patent was issued on November 26, 1991.

The parties agree that "malleoli" is the lateral malleolus and medial malleolus, which are the portions of bones that protrude from each side of the ankle. It further appears that both parties agree that if the ASO EVO is covered under any terms of the '486 patent that the ASO EVO is, therefore, a "similar item" under the 1996 Settlement Agreement. Such a

-15-

determination will likely narrow the issues for trial or may aid the parties in settlement discussions.

        **B.**       **Disputed Claim Terms, Phrases, and Clauses**

            **1.**       **First Claim Term: "a pair"**

The word "pair" is used in the phrases "pair of binding straps" and "pair of elongate non-elastic binding straps" but is not defined in the specification or file history. The court heard testimony and examined samples of the ASO ankle stabilizing device and notes that the straps consist of a single piece of material that is sewn to the body of the device at the center of the strap so that each end wraps separately around the foot. Plaintiff claims that "pair" should be defined as a single thing made up of two corresponding parts that are used together, such as a pair of pants or a pair of scissors. Defendant defines "pair" slightly different as "a single thing made up of two corresponding parts or two corresponding, but separate, things designed for use together." John Hely, who is credited as the inventor of the ASO and a vice-president for defendant, stated during his 2003 deposition that he considers the piece of material to constitute one strap. See Hely Deposition, p. 41. The court concludes that plaintiff's definition and defendant's previous definition are consistent and finds that "pair" is best defined as a "single thing made up of two corresponding parts that are used together, such as a pair of pants or a pair of scissors."

            **2.**       **Second Claim Term: "a first end fixed to said ankle portion at said rear edge portion thereof and at an elevation so as to be located above the malleoli of the wearer"**

This term is found at least once in the patent claim but is not defined in the

specification or file history, although the patent distinguishes between items which are "fixed" as opposed to "attached." The Summary of the Invention describes the straps as "fixed at one end" as well as having a "free end." Col. 2:18-22, 50-53. Claim 1, *supra,* describes a "rear edge portion" as that "which extends vertically between the inside and outside panels and thus along the Achilles tendon of the wearer." Col. 2:8-13, col. 4:10-19. The parties agree that "malleoli" means "above the lateral malleolus or medial malleolus, which are the portions of bones that protrude from each side of the ankle of the wearer."

Plaintiff contends the dictionary definitions of "fix" must allow for a moveable strap to stay in place while the device is worn but allows the strap to move when not in use, although plaintiff cites dictionaries published in 1999 and 2000. Plaintiff also claims that defendant should be bound by its previous admission in McDavid that "fix" should mean "to place securely, make stable or firm." Medical Specialties, Inc. v. McDavid Knee-Guard, Inc., Case No. 3:00cv282 (W.D.N.C.), # 17, pp. 10-11. Additionally, defendant's Vice-President declared in McDavid that "the rear edge portion of the patented invention encompasses the entire rear boot."

The general rule is that the court must presume that the terms in the claims should be construed according to their ordinary and accustomed meeting. Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 958, 989 (Fed. Cir. 1999). To the extent that each party relies upon a different dictionary definition, the court finds that terms published at approximately the same time in which the terms were used are appropriate. While the common definitions of terms have not changed considerably, dictionary definitions from 1991 are more

appropriate references as they were those in common use during the relevant period, rather than dictionaries published in 1999 and 2010, years after the '486 patent issued and the Settlement Agreement was finalized.  See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1299 (Fed. Cir. 2003).

Having considered the proposed claim construction by both parties, the court relies on the language of the claim itself, as well as defendant's prior admission in McDavid.  The court concludes that the term "a first end fixed to said ankle portion at said rear portion thereof and at an elevation so as to be located above the malleoli of the wearer" means "a first end that is opposite a free end, the first end being fixed or attached, not releasably attached, on the rear portion of the boot like body member which extends vertically between the inside and outside panels and thus along the Achilles tendon of the wearer, and located at a height above the malleoli."

3.  **Third Claim Term: "said straps extending laterally in opposite directions and so as to define an inside strap extending from the rear edge portion toward said inside panel and an outside strap extending from said rear edge portion toward said outside panel"**

The '486 patent uses this claim term at least three times (col. 2: 22-27; col. 6: 62-66; col. 8: 35-39).  Plaintiff argues that this clause should be construed defining "laterally" as "toward, or from the side or sides."  Defendant claims that there is no basis for accepting such a definition, in light of the "rear edge portion" limitation which it defines as extending "vertically between the inside and outside panels and thus along the Achilles tendon of the wearer."  Defendant argues that the term should mean "the stabilizing straps extend laterally

in opposite directions and define an inside strap that extends from the portion of the boot-like body member which extends vertically between the inside and outside panels and thus along the Achilles tendon of the wearer toward the inside panel and an outside strap that extends from the portion of the boot-like body member which extends vertically between the inside and outside panels and thus along the Achilles tendon of the wearer toward the outside panel."

Having previously determined that "rear edge portion" refers to the rear end of the boot which extends vertically between the inside and outside panels and thus along the Achilles tendon of the wearer, separate from the inside and outside panels, the court cannot now accept plaintiff's definition of "laterally." Therefore, the phrase "said straps extending laterally in opposite directions and so as to define an inside strap extending from the rear edge portion toward said inside panel and an outside strap extending from said rear edge portion toward said outside panel" is construed to mean "straps extending laterally in opposite directions, one from the inside of the rear portion of the boot like body member toward the inside panel of the boot, and one on the outside of the rear portion of the boot like body member toward the outside panel of the boot."

**4. Fourth Claim Term: "at an elevation corresponding to that of said stabilizing straps**

This term is never defined but refers to the elastic binding straps and is found twice in the patent (col. 7:7-8; col. 8:49-50). The first, fixed ends are attached to the rear edge portion at an elevation that is equal to that of the stabilizing straps. Plaintiff uses a dictionary

definition of "corresponding" to mean similar in character, form, or function.

Defendant proposes that the first fixed ends be located "at an elevation that is the same as the first fixed ends of the stabilizing straps." Defendant notes that the court determined in <u>McDavid</u> that the "binding straps in the '486 patent overlie the stabilizing straps generally, not just the fixed ends specifically." <u>McDavid</u>, Mem. and Order, p. 10. The court vacated the Order, and defendant further contends that the specific finding was in error based upon a subsequent case, <u>Honeywell Int'l v. Hamilton Sundstrand Corp.</u>, 370 F.3d 1131, 1142 (Fed. Cir. 2004) (*en banc*) (holding that prosecution history estoppel applies if the scope of the subject matter claimed in a rewritten independent claim has been narrowed to secure the patent). Defendant includes the '486 partial file history (attached to Resp. re: Patent Claim Construction Br. as Exhibit H) to demonstrate that the "at an elevation corresponding to that of said stabilizing straps" limitation was added during prosecution to obtain the patent and prosecution history estoppel applies to the limitation.

The court agrees with defendant's claim construction and concludes that "at an elevation corresponding to that of said stabilizing straps" means "at an elevation that is the same as the first fixed ends of the stabilizing straps."

### 5. Fifth Claim Term: "across"

The claim makes several references to the stabilizing straps extending from the rear edge portion across the inside and outside panels. For example, the outside strap wraps from the outside panel, across the front of the boot, under the heel, and adheres to the outside panel. The inside strap wraps from the inside panel, across the front of the boot, under the

heel, and adheres to the inside panel. Because the term is not defined by the parties but used multiple times throughout the specification, plaintiff argues that the dictionary definition should be used: "from one side to the other (of something)." Pl. Br., p. 22. Defendant suggests that a dictionary definition of "from one side to the opposite site of" is more consistent with the specification and was published during the same year in which the '486 patent was issued.

Having reviewed the specification and finding several references to the term "opposite," including: "opposing laterally spaced apart front edges," col. 2:5-6, "an outside panel on the opposite site of the ankle," col. 2:9-10, and "the inside strap is brought across the inside panel of the ankle portion, over the top of the wearer's foot, under the wearer's foot . . .," col. 2:32-35. The court finds that either party's definition would be appropriate but defers to defendant's definition, which is consistent with the time period in which the patent was granted and is more precise. The court, therefore, defines "across" as "from one side to the opposite side of."

## ORDER

**IT IS, THEREFORE, ORDERED** that the disputed claim terms of U.S. Patent No. 5,067,486 are hereby construed as follows:

(1)     The term "a pair" is construed as a single thing made up of two corresponding parts that are used together, such as a pair of pants or a pair of scissors.

(2)     The term "a first end fixed to said ankle portion at said rear edge portion thereof and at an elevation so as to be located above the malleoli of the wearer" is construed as "a first end that is opposite a free end, the first end being fixed or attached, not releasably attached, on the rear portion of the boot like body member which extends

vertically between the inside and outside panels and thus along the Achilles tendon of the wearer, and located at a height above the malleoli."

(3)     The term "said straps extending laterally in opposite directions and so as to define an inside strap extending from the rear edge portion toward said inside panel and an outside strap extending from said rear edge portion toward said outside panel" is construed as "straps extending laterally in opposite directions, one from the inside of the rear portion of the boot like body member toward the inside panel of the boot, and one on the outside of the rear portion of the boot like body member toward the outside panel of the boot."

(4)     The term "at an elevation corresponding to that of said stabilizing straps" is construed as "at an elevation that is the same as the first fixed ends of the stabilizing straps."

(5)     The term "across" is construed as "from one side to the opposite side of."

**IT IS SO ORDERED.**

Signed: December 17, 2012

Max O. Cogburn Jr.
United States District Judge